UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                    :

INOCENCIA HERRERA TAVERAS, acting  :
on behalf of infant child, L.A.H.,[1]        :
                                      :

                     Petitioner,  :

         -v-                    :

                                      :

JOSE ALONZO MORALES,           :

                                      :

                    Respondent.  :

                                      :
------------------------------------------------------------X

No. 13 Civ. 7743 (RA)

OPINION AND ORDER

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/16/2014

RONNIE ABRAMS, United States District Judge:

Before the Court is Inocencia Herrera Taveras's Petition seeking return of her minor child, LAH, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, reprinted in 51 Fed. Reg. 10,494 (Mar. 26, 1986) (hereinafter, "Hague Convention" or "Convention"), as implemented by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 et seq.

Petitioner, who resides in Spain, alleges that she allowed LAH to travel to the United States to reside temporarily with the child's father, Respondent Jose Alonzo Morales, who wrongfully retained the child. As explained more fully below, the Court concludes that although Petitioner has made out a *prima facie* case, Respondent has established that the child is now "settled" in the United States—an affirmative defense under Article 12 of the Convention. Accordingly, the Petition is denied.

---

[1]      The Clerk of Court is respectfully requested to remove the child's full name from the public docket.

## FINDINGS OF FACT

The Court held a five-day hearing from March 3 to March 7, 2014, at which it heard testimony from Petitioner, Respondent, Respondent's mother, Sonia Portugal (a social worker who treated LAH), and Gabriela Martin (Petitioner's Spanish counsel). The Court also interviewed LAH in Chambers, with only a court reporter and interpreter present. (See Hr'g Tr. ("Tr.") 244-283.) During this interview, the Court and eight-year-old LAH sat on the floor and played with puzzles and coloring books while talking. In advance of this conversation, the Court solicited questions from the parties, many of which were asked during the interview.

The following constitute the Court's findings of fact under Federal Rule of Civil Procedure 52(a). As necessary, the Court makes additional factual findings in other sections of this Opinion, which it will specifically designate as such findings.

### 1.    LAH's Birth and Early Years

LAH, who is the child of Petitioner and Respondent, was born in Santo Domingo, Dominican Republic, on September 20, 2005. (Parties' Stipulation of Facts ("Stipulation") ¶¶ 1-2.) Petitioner and Respondent, who have never married, lived together with LAH in the Dominican Republic from the child's birth until September 2007. (Id. ¶ 3.)

The parties separated in September 2007. (Id. ¶ 4.) In the years following the separation, LAH changed households frequently, although she always lived with her mother, her father, or another family member. Immediately following the September 2007 separation, LAH lived with her mother in the Dominican Republic. (Id. ¶ 4; Tr. 25:4-6.) In approximately March 2008, Petitioner moved to Spain in order to take advantage of a better economic climate, and the child began to live with Respondent, who remained in the Dominican Republic. (Stipulation ¶ 5; Tr.

28:12-29:4.) In a document signed in September 2008, Respondent acknowledged that his care

of his daughter was only "temporary" and that, based on the "friendship between both parties,"

he would return the child to her mother "at the very moment she requests so." (Pet'r's Ex. 5 at 1-

2.) Consistent with this agreement, Respondent returned the child to Petitioner on December 9,

2009, when Petitioner returned to the Dominican Republic after acquiring Spanish residency.

(Tr. 35:9-16; Pet'r's Ex. 50 / Resp't's Ex. 52A.[2])

## 2.    The Custody Dispute and Final Order

Beginning in 2010, the parties' informal and amicable custodial arrangement gave way to

a more contentious relationship.  In early March of that year, Petitioner decided to return to

Spain and made plans to leave the child with Respondent.  (Tr. 37:17-23.)  Because, in

Respondent's view, the child had been in his care for most of the previous two years, he

requested that he be granted legal custody.  (Pet'r's 51 / Resp't's Ex. 53A.)  The parties appeared

before an "Assistant Public Prosecutor for Children and Adolescents" in the Dominican

Republic, put their positions in writing, and stated that they were unable to reach an agreement

regarding custody.  (Id.) Petitioner left for Spain soon thereafter, and Respondent again assumed

care of the child.  (Tr. 37:21-23; Stipulation ¶ 6.)

Three months later, in June 2010, Petitioner returned to the Dominican Republic from

Spain.  (Tr. 37:24-38:3.)  A document executed on June 7, 2010, reflects that the parties again

attempted to reach an agreement concerning custody of the child but were unable to do so.

(Pet'r's Ex. 52 / Resp't's Ex. 51.)  The child then moved in with Petitioner (Tr. 52:21-25), and

the dispute over custody continued until Sunday, August 29, 2010.

Although the parties dispute the events of that day, they agree that in the morning or early

---

[2]        A number of exhibits are cross-marked.  For ease of reference, the Court provides both numbers.

afternoon Respondent arrived at Petitioner's home and took the child, over Petitioner's objection.[3] (Id. at 40:20-41:4; 521:4-6.) Petitioner—who was seven months pregnant with LAH's half-sister—then traveled to Respondent's home in an attempt to recover LAH. (Id. 40:18-19, 41:6-9, 521:19-20.) This is where the parties' accounts diverge.

Petitioner asserts that when she arrived at Respondent's home, she attempted to open the outer gate to Respondent's front door when he "pushe[d] the gate against . . . [her] womb" and closed the gate on her hand, causing her to "bleed[ ] very much." (Tr. 41:9-12, 43:10-12; Pet'r's Ex. 9.) After receiving medical attention, Petitioner testified, she was in the process of contacting the police when her new husband received a call from Respondent's uncle, who explained that Respondent would agree to give custody of LAH to Petitioner "so that no complaint [would have] to be made." (Tr. 43: 9-23.)

According to Respondent, Petitioner arrived at his house demanding LAH and put her foot under the outer gate in the entryway so that he could not close the inner door. (Id. at 522:1-6.) He asserts that when he reached down to attempt to move Petitioner's foot, she reached through the outer gate with a knife and began to strike at him. (Id. at 522:6-19.) He was then able to close the door. (Id. at 522:25-523:2.) Respondent later handed over the child to a neighbor, who returned her to Petitioner. (Id. at 524:9-13.) That evening, he learned that Petitioner's brother and nephew were looking for him to beat him up and leave him "crippled." (Id. at 525 18:25.) Respondent subsequently agreed to sign a custody agreement. (Id. at 526:9-22.) He testified that he did so "in order for [Petitioner] to let me be—to leave me alone." (Id. at 527:2-3.)

---

[3]    According to Respondent, he did so because Petitioner refused to purchase the child's school supplies and, because of his work schedule, that afternoon was his last opportunity to do so before the child began classes. (Id. at 521:6-9; 568:20-569:13.)

4

For purposes of the instant Petition, the Court need not decide which version of the events is accurate. The important point is that on the following day the parties signed an agreement stating that Respondent "relinquishes and gives custody of the minor [LAH] to Ms. Inocencia Herrera Taveras"; that "Ms. Inocencia Herrera Taveras accepts custody of the minor [LAH], with all legal consequences"; and that "Mr. José Leopoldo Alonzo Morales will have visitation with his daughter during the school vacation period and will maintain phone communication with her." (Resp't's Ex. 13 at 3-4.) On September 10, 2010, the First Court of Children and Adolescents of the National District in the Dominican Republic issued an order that "approved" the parties' August 30, 2010 agreement. (Pet'r's Ex. 10 at 8.)

Petitioner returned to Spain in early September (Tr. 53:13-14); after her departure, LAH, who remained in the Dominican Republic, lived with Petitioner's mother and visited with Respondent on weekends (id. at 53:21-25, 558:5-11; Pet'r's Ex. 11). On February 2, 2011, LAH left the Dominican Republic to live with Petitioner in Spain. (Stipulation ¶ 8).

### 3.    LAH's Life in Spain

LAH was approximately five-and-a-half years old when she arrived in Valladolid, Spain. (Tr. 67:20.) She lived there with Respondent, Respondent's sister (LAH's aunt), and Respondent's other daughter (LAH's half-sister), W, who was three months old when LAH arrived. (Id. at 67:4-8, 17-18.) LAH became a legal resident of Spain by April 2011 (id. at 71:22-72:1; Pet'r's Ex. 18), and remained there until May 2012 (Stipulation ¶ 11).

Petitioner testified that, while in Spain, she worked as a hairdresser and consultant for a line of beauty products, and LAH attended school and participated in several extracurricular activities. (Tr. 68:24-25, 72:16-21, 76:20-24; Pet'r's Ex. 20.) She testified further that LAH's

grades were initially "very, very low" and she had behavioral problems, but that her performance

in school improved over time. (Tr. 74:24-75:13.)  According to Petitioner, LAH had several

friends in Spain and had a close relationship with her half-sister, W. (Id. at 78:1-15.)

Although LAH was reluctant to discuss her life in Spain with the Court, she noted that

the part of the country where she lived was "really, really good in the night," that she

remembered playing with her sister and visiting "a little park" with horses, and that her home

had a big patio or yard. (Id. at 253:25-254:11, 265:9-12.)  Not all of her memories were positive,

however.  LAH also discussed instances in which her mother "mistreated" her, by pulling her

hair while combing it (in LAH's view, purposely attempting to hurt her), pulling her ear, and

striking her with a slipper. (Id. at 254:15-256:2.)  LAH also explained that her aunt, who lived

with her, "liked to smoke," which bothered her, and that her aunt's boyfriend would "get

drunk."[4] (Id. at 256:7-16.)  When asked what she thought her life would be like if she returned

to Spain to live with her mother, LAH responded that she would "be sad." (Id. at 269:21-25.)

Respondent testified that he called LAH approximately every other day while she was in

Spain. (Id. at 531:12-13.)  On one occasion, he explained, while on the phone with LAH she

described how she and her younger sister were home by themselves, and told Respondent that

the babysitter had locked them in the house and left. (Id. at 534:13-25.)  When Respondent

spoke to the babysitter approximately twenty-five minutes later, her statements and demeanor

gave him the impression that it was not the first time the children had been left by themselves.

(Id. at 534:24-535:9.)  In her testimony, Petitioner acknowledged that she occasionally traveled

for work and spent two weeks in the Dominican Republic, but emphasized that she never left

---

[4]      LAH also stated that, while drunk, her aunt's boyfriend would "touch her." (Tr. 256:15-16.) Upon further
questioning by the Court, she clarified that he only touched her "in the arm and in the face"—nowhere else—and
that he stopped after LAH complained to Petitioner. (Id. at 256:17-257:9.)

6

LAH in the care of someone LAH did not know.  (Id. at 82:16-83:2, 83:25-84:2.)  Petitioner further testified that if she had learned that anyone had mistreated LAH, she would not have left her children with that person in the future.  (Id. at 83:3-7.)

**4.      LAH's Travel to the United States**

In the background of LAH's early years was the prospect that Respondent, and ultimately LAH, would obtain lawful residence in the United States.  Respondent's mother obtained residence in 1998 through her sister, who was a United States citizen.  (Id. at 210:4-9; Resp't's 39A at 251.)  With his mother's "sponsorship," Respondent applied for residence in 2000, before LAH was born.  (Tr. 211:7-8, 517:14-518:8.)  Respondent moved to the United States in April 2011—while LAH was in Spain—and eventually obtained his residence.  (Tr. 492:15-16, 539:18-25; Stipulation ¶ 9.)

When Respondent became aware that he could also apply for LAH's residence, he conferred with Petitioner, who agreed that LAH should apply for United States residence.  (Tr. 518:9-25.)  LAH's application for residence was submitted in 2008.  (Id. at 518:10.)

**a.      Arrival in the Dominican Republic**

In April 2012, the United States embassy in the Dominican Republic contacted Respondent to inform him that it had scheduled an interview for LAH's permanent residence application.  (Tr. 541:1-5; Resp't's Ex. 25A at 166.)  Although Petitioner was initially resistant, eventually she agreed to send LAH to the Dominican Republic and, ultimately, the United States.  (Tr. 541:16-542:2, 542:19-544:5.)  LAH arrived in the Dominican Republic on May 5, 2012, and completed the consular interview, accompanied by Respondent and his mother.  (Id. at 544:4-9.)

LAH remained in the Dominican Republic until early July.  She spent part of that time

living with Petitioner's family and part living with Respondent, his mother, and other members

of his family. (Tr. 87:17-20, 90:9-12.) Respondent left the Dominican Republic for the United

States on June 26, 2012, and Petitioner arrived in the Dominican Republic from Spain on June

28, 2012. (Tr. 89:23-90:4, 544:17-19.)

      **b.**    **Agreements Concerning LAH's Travel to the United States**

There is no dispute that—with Petitioner's permission—LAH traveled from the

Dominican Republic to the United States accompanied by Respondent's mother and arrived in

the United States on July 12, 2012. (Tr. 224:19-20; Stipulation ¶ 12.) The conditions under

which Petitioner agreed to send LAH to the United States are hotly contested, however, and the

scope of her consent is one of the central questions in this case.

Petitioner, Respondent, and Respondent's mother were examined extensively about this

issue. Each gave a slightly different account of the discussions leading up to LAH's visit to the

United States, as well as the parties' conversations after LAH's arrival. The Court considers

these accounts, as well as the written documents that the parties executed in advance of LAH's

trip to the United States.

Written Agreements: Between 2008 and LAH's entry into the United States in 2012,

Petitioner and Respondent executed a number of agreements related to LAH's application for

United States residence. The first such document was a November 2008 power of attorney, in

which Petitioner gave Respondent consent to sign on her behalf "as much documentation

deemed necessary" for LAH to obtain her residence. (Pet'r's Ex. 6 / Resp't's Ex. 37.)

Additionally, in a document executed on May 5, 2010, Petitioner agreed that when the

United States contacted Respondent about scheduling LAH's "appointment" for her legal

residence, Petitioner would send the child to the consulate in the Dominican Republic and would permit her to travel to the United States. (Pet'r's Ex. 8 / Resp't's Ex. 99.) Respondent, in turn, agreed to return LAH to Petitioner "as soon as the Migration Department of the United States of America sends us the residence card." (Id.) The parties further agreed that LAH would "reside and study in Spain with her mother," and that she would "spend December and summer holidays in the United States of America with her father." (Id.)[5]

On July 2, 2012—shortly before LAH left the Dominican Republic for the United States—the parties executed another document, in which Petitioner granted power of attorney to Respondent and his mother "so that [her] daughter [LAH] may travel accompanied by her grandmother to the United States to obtain United States residency." (Pet'r's Ex. 30 / Resp't's Ex. 38A.)[6]

In addition to these three documents, Petitioner asserted that the parties also executed a fourth document, dated January 6, 2010. (Pet'r's Ex. 7.) Although this document is largely similar to the others—in that it grants Respondent and his mother power of attorney so that LAH can travel to the United States and obtain her residence—the document contains an important provision not found in any of the other documents: it states specifically that "the principal commits to send the child home to her father José Leopoldo Alonzo Morales, for six (6) months to allow the child to obtain the residency." (Id.) This agreement is the only document that references a defined time period after which LAH was to be returned to Spain—an important fact in determining when the retention became "wrongful," a critical but disputed issue.

---

[5]     Although in the original of this document the area where the parties signed is not visible, Respondent acknowledged signing the document. (Tr. 548:1-17.)

[6]     Respondent, who returned to the United States on June 26, 2012 (Tr. 544:17-19), testified that he signed the July 2, 2012 power of attorney before he left the Dominican Republic, (Id. at 546:5-9).

Although this document purportedly contains the signatures of both Respondent and Respondent's mother, both denied having signed it and asserted at the hearing that they had not seen the document until they were shown it in connection with this Petition. (Tr. 224:21-225:24, 547:12-21.) The Court credits their testimony and finds that the January 6, 2010 "Special Power for Travel Purposes" (Pet'r's Ex. 7) was not signed by either Respondent or his mother.

The Court makes this finding primarily because of several inaccuracies on the face of the document. In particular, the typed name of Respondent's mother and corresponding signature are both misspelled. Respondent's mother testified that her name is "Cirsa Morales de Rosario" (Tr. 209:22-24), a spelling that is consistent with her permanent resident card (Resp't's Ex. 39A at 251), her social security card (id.), and the July 2, 2012 power of attorney that she acknowledges signing (Pet'r's Ex. 30 / Resp't's Ex. 38A; Tr. 222:12-223:5).[7] The January 6, 2010 document, however, lists Ms. Morales's name as "Sisa Morales Del Rosario." (Pet'r's Ex. 7.)[8]

When confronted with the misspelling, Petitioner attributed it to Ms. Morales's refusal to provide identification that displayed the correct spelling of her name. (Tr. 141:13-25.) That explanation could be plausible if the only misspelling were on the typed document. The handwritten signature, however, also reflects the incorrect spelling, "Sisa Morales del Rosario." (Pet'r's Ex. 7.) The Court finds it implausible that Ms. Morales would sign her name incorrectly—using "Sisa" instead of "Cirsa" and "del Morales" instead of "de Morales."[9]

---

[7]     The July 2, 2012 power of attorney refers to Ms. Morales as "Cirsa Morales Santana de Rosario," but the witness's signature on that document is "Cirsa Morales de Rosario." (Pet'r's Ex. 30 / Resp't's Ex. 38A.)

[8]     The Court notes that this incorrect spelling is also used in the document Petitioner filed with the Spanish authorities to initiate the instant Petition. (Pet'r's Ex. 31 at 8.)

[9]     Additionally, although the document recites that it was "READ AND SIG[ ]NED IN GOOD FAITH, in the City of San Juan de la Manguana, the Dominica[n] Republic" (Pet'r's Ex. 7), Petitioner stated that the document was

Accordingly, it credits the testimony of Respondent and his mother that they did not sign the document.

Non-Written Agreements: Petitioner, Respondent, and Respondent's mother each testified about the conversations they had (and did not have) related to LAH's travel to the United States and the agreements described above.

Petitioner presented two different versions of her understanding of the circumstances under which she permitted LAH to travel to the United States. Petitioner first stated, in a filing in a related New York state court proceeding (described further below), that "Respondent was supposed to send the child back to Spain at the end of the summer"—2012— "so the child would be present for the start of the Spanish school year." (Resp't's Ex. 20 at 103 ¶ 13.) When confronted with this statement on cross examination and again on redirect examination at the hearing, Petitioner confirmed that Respondent was supposed to have returned the child by the end of summer 2012. (Tr. 191:18-192:4, 195:13-24.)

Without acknowledging the apparent contradiction, Petitioner gave a second, slightly different, account. She testified about a conversation she had with Respondent in April 2012, when he informed her of LAH's consular interview and stated: "What I'm interested in is that LAH have her residency from New York. After that I'll send the girl to Spain with you." (Tr. 97:10-12.) According to Petitioner, she then consented to send LAH "for a maximum stay of six months" and Respondent agreed. (Id. at 97:23-25.) Petitioner asserts that Respondent's mother confirmed this understanding—that "LAH is going to New York for a maximum period of six months"—when Petitioner dropped off the child at the airport in the Dominican Republic. (Id. at

---

signed by Respondent and his mother at Respondent's home in Santo Domingo, which is a three-hour bus trip from San Juan (Tr. 139:18-19; 142:8-17). This inaccuracy provides a further reason for questioning the genuineness of the signatures.

98:20-99:5.)

Respondent, on the other hand, acknowledged that in signing the May 5, 2010 agreement
(Pet'r's Ex. 8 / Resp't's Ex. 99), he committed to return LAH to Spain after she obtained her
permanent residence (Tr. 546:14-547:5).  He also testified, however, that he never told Petitioner
"that LAH would only stay in the United States for a specific period of time."  (Id. at 546:12-16.)

Finally, Respondent's mother, Ms. Morales, testified that she never "promise[d] to send
LAH back to Spain after a certain amount of time" (Tr. 221:11-13); that she did not understand
that LAH would be leaving the United States at all after obtaining her residency (Tr. 224:6-11);
and that Petitioner did not "put any condition on how long LAH could stay in the United States"
(Tr. 221:7-10).

### c.      Life in the United States

Although the Court describes LAH's life in the United States more fully when addressing
whether she is now "settled," several observations are appropriate.

Upon her arrival in the United States, Respondent enrolled LAH at PS 4, Duke Ellington,
in Manhattan.  (Id. at 501:9-17.)  During her conversation with the Court, LAH described life at
school, boasted that her "points" level is "very, very good," and detailed particular assignments.
(Id. at 247:1-5, 270:25-271:20.)  LAH lives in an apartment with her father and grandmother—
sharing a bed with her grandmother—and frequently visits other family members in Manhattan.
(Id. at 248:18-21, 515:25-516:11, 561:23-562:2.)  She described her daily routine, as well as her
friends and family.  (Id. at 247:10-21, 250:18-251:19.)

Several witnesses described certain behavioral problems and other issues that affected
LAH when she arrived in the United States (some of which begun in the Dominican Republic),

12

including that she frequently hid in closets and refused to come out, urinated on herself

throughout the day, and refused to follow instructions.  (Id. at 75:7-76:15, 226:5-21, 344:16-24.)

A social worker, Sonia Portugal, testified that she had been treating LAH for these issues (id. at

344:4-21), and that LAH has shown improvement (id. at 360:9-23).

 When the Court asked LAH whether she would rather live with her father in New York

or her mother in Spain, she responded that she wished to live with her father in New York

"[b]ecause he loves me.  Because he buy[s] me toys."  (Id. at 263:24-25.)

### 5. Petitioner's Requests that LAH Be Returned to Spain

 Respondent and his mother testified that approximately twenty-eight days after LAH

entered the United States they were informed that she had received her residence (id. at 237:3-5,

494:17-18, 551:20-22, 608:18-20), and Petitioner does not dispute that LAH received her

residence card at approximately this time (id. at 504:3-5). According to LAH's permanent

residence card, she became a United States resident on July 11, 2012.  (Resp't's Ex. 25 at 173.)

 Although the parties do not dispute when LAH received her residence, they do dispute

the date on which Respondent conveyed this fact to Petitioner.  According to Respondent, he told

Petitioner that LAH had obtained her permanent residence almost immediately after LAH

received the card—approximately twenty-five to thirty days after LAH had arrived in the United

States.  (Id. at 551:20-552:2, 553:18-25,  556:9-11, 609:23-610:1.)  Respondent testified further

that Petitioner demanded LAH's return (id. at 552:5-6, 554:11-12, 556:12-13), and recalled

conveying to Petitioner his fear that LAH would "go out into the street" (id. at 552:3-23).

According to Respondent, although he never explicitly refused to return LAH (id. at 553:10-13,

554:18-23), at no point did he commit to returning her or ask to extend her stay (id. at 553:14-17,

556:14-22, 610:2-11).  Respondent's conversations with Petitioner, he explained, "didn't happen

at one exact date," but rather "were happening" in the months after LAH arrived in the United

States.  (Id. at 554:13-17.)

Petitioner, meanwhile, testified that after LAH arrived in the United States, Respondent

repeatedly dodged her questions about whether the child had received her residence, stating only

that "[t]hings will arrive."  (Id. at 100:5-18, 196:2-8.)  According to Petitioner, the first time

Respondent told her that LAH had received her residence was in a conversation on November

25, 2012.  (Id. at 100:15-102:2.)  After "try[ing] not to touch upon that topic" for several weeks,

Petitioner asserts, in late December she revisited the subject, at which point Respondent stated

that he was not going to return LAH.  (Id. at 102:24-103:13.)

### 6.      Legal Proceedings

Petitioner testified that in late December 2012, while in the Dominican Republic, she met

with an attorney and drafted a proposed agreement, under the terms of which Respondent would

agree to return the child to Spain at the end of the 2012-2013 school year.  (Id. at 105:17-23;

Pet'r's Ex. 48A.)  Respondent did not sign the agreement or agree to return the child at the end

of the school year.  (Tr. at 106:17-21, 592:17-19, 594:6-9; Pet'r's Ex. 48A at 4.)  When

Petitioner returned to Spain in early 2013, she met with Spanish counsel and submitted a

"Request for Return" to the Spanish government, which was ultimately transmitted to the United

States Department of State.  (Tr. 107:11-17; Pet'r's Ex. 31.)

Meanwhile, on December 11, 2012, Respondent filed an action in New York State

Family Court ("Family Court") to obtain custody of LAH.[10]  Respondent attempted to serve

---

[10]      The Court takes judicial notice of these state court filings.  See, e.g., Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006).

Petitioner with the summons and petition in that action at an incorrect address (Tr. 115:25-118:12; Pet'r's Exs. 55-56 / Resp't's Exs. 5-6), and after Petitioner failed to appear, Family Court awarded Respondent custody of LAH on June 14, 2013. On August 12, 2013, Petitioner—represented by present counsel—filed an action in Family Court to enforce the September 10, 2010 custody order from the Dominican Republic. The parties have represented that this action—which the Court will refer to as the "UCCJEA Action"[11]—has been stayed pending the outcome of the action before this Court.

The instant Petition was filed in this Court on October 31, 2013. (Dkt. no. 1.) Respondent was appointed *pro bono* counsel and, over Petitioner's objection—but consistent with the procedures of other courts that have adjudicated Hague Convention cases, see Johnson v. Johnson, No. 11 Civ. 37(RMB), 2011 WL 569876, at *2 (S.D.N.Y. Feb. 10, 2011)—the Court also appointed an attorney, Elliot Podhorzer, to represent LAH.[12] After limited discovery, the five-day evidentiary hearing, and post-hearing briefing, the Petition was fully submitted on April 4, 2014.

## DISCUSSION

The Hague Convention "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." Abbott v. Abbott, 560 U.S. 1, 8 (2010). Its stated aims are "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, Art. 1.

---

[11]     Petitioner brought this action under the Uniform Child Custody Jurisdiction and Enforcement Act, as codified by New York. See N.Y. Dom. Rel. Law §§ 75-78a.

[12]     Mr. Podhorzer also represents LAH in the state court proceedings.

Consistent with these aims, the Convention's "central operating feature is the return of the child." Lozano v. Alvarez, 134 S. Ct. 1224, 1228 (2014). This remedy "is designed to preserve the status quo in the child's country of habitual residence and deter parents from crossing international boundaries in search of a more sympathetic court." Souratgar v. Lee, 720 F.3d 96, 101 (2d Cir. 2013). A decision under the Convention "shall not be taken to be a determination on the merits of any custody issue." Hague Convention, Art. 19; see also Mota v. Castillo, 692 F.3d 108, 112 (2d Cir. 2012) ("[T]he Convention's focus is simply upon whether a child should be returned to her country of habitual residence for custody proceedings.").

To be entitled to repatriation, the petitioner "must prove that the child was removed from a State party in which she was 'habitually resident,' and that the removal was 'wrongful.'" Hollis v. O'Driscoll, 739 F.3d 108, 111 (2d Cir. 2014). Return of the child is not automatic, however, even after such a *prima facie* showing. Rather, the court must also consider whether the respondent has established one of the Convention's five affirmative defenses: (1) the proceeding was commenced more than one year after the wrongful removal or retention and the child "is now settled in its new environment," Hague Convention Art. 12; (2) the person having care of the child at the time of removal or retention was not exercising custody rights or acquiesced in the removal or retention, id. Art. 13(a); (3) returning the child would expose him or her to a "grave risk" of "physical or psychological" harm, id. Art. 13(b); (4) the child objects to being returned and is sufficiently mature for the Court to consider its views, id.; and (5) return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms," id. Art. 20.

### 1.    Petitioner's *Prima Facie* Case

To make out a *prima facie* case under the Hague Convention, the petitioner must show that "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." Gitter v. Gitter, 396 F.3d 124, 130 (2d Cir. 2005). The petitioner must establish each of these elements by the preponderance of the evidence. 42 U.S.C. § 11603(e)(1)(A).

Respondent challenges only the first element. (Resp't's Post-Trial Br. ("Resp't's Br.") at 18.) He argues that because Petitioner permitted LAH to travel to the United States to obtain permanent residence, and because permanent residents may leave the United States only temporarily and must always intend to return, Petitioner therefore must have intended that LAH would make the United States her home. (Id. (citing 8 U.S.C. § 1101(a)(27)(A) and 22 C.F.R. § 42.22(a)).) This argument is unpersuasive because it ignores the parties' testimony about their intentions surrounding LAH's travel to the United States.

The Hague Convention does not define the term "habitual residence." The Second Circuit has explained, however, that in determining a child's habitual residence, courts must first "inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared." Gitter v. Gitter, 396 F.3d 124, 134 (2d Cir. 2005). The child acquires a "new habitual residence" if the parents formed "a settled intention to abandon the one left behind." Id. "Normally the shared intent of the parents should control the habitual residence of the child." Id. If, however, "the evidence unequivocally points to the

17

conclusion that the child has acclimatized to the new location," the court may find that the child has acquired a new habitual residence, "notwithstanding any conflict with the parents' latest shared intent."  Id.

Here, Petitioner provided inconsistent accounts of how long she agreed to allow LAH to remain in the United States awaiting her residency—an issue the Court addresses in the following section.  The record is clear, however, that Petitioner understood that the child would eventually return to live in Spain.  This understanding is manifest in the parties' May 5, 2010 "Amicable Agreement," which provided that after LAH obtained her residency, she was to "reside and study in Spain with her mother" and would "spend December and summer holidays in the United States of America with her father."  (Pet'r's Ex. 8 at 2 / Resp't's Ex. 99 at 2.)  The parties' August 30, 2010 custody agreement confirms this understanding.  (Resp't's Ex. 13 at 4 ("Mr. José Leopoldo Alonzo Morales will have visitation with his daughter during the school vacation period and will maintain phone communication with her.").)

Respondent argues that by sending LAH to the United States to obtain permanent residence, Petitioner intended that her child would reside permanently in the United States.  The second proposition, however, does not necessarily follow from the first.  Petitioner testified that she understood "that the girl was to have both documents, the ones from Spain as well as the ones from the United States, because that way, the girl could travel without any problems to spend the holidays with her father and so that she could reside and study with me in Spain."  (Tr. 47:11-15.)  The Court need not address Respondent's argument regarding whether this country's immigration laws permit such an arrangement.  Even assuming they do not, Gitter and its progeny make clear that the focus of the habitual residence inquiry is on the parents' intentions.

See 396 F.3d at 132 ("Courts should consequently pay close attention to intentions."); Mota, 692
F.3d at 113 ("[O]ur primary consideration in determining a child's place of habitual residence is
the shared intention of the child's parents at the latest time that their intent was shared"). Here,
Petitioner testified unequivocally that she understood that Spain would be the child's residence,
and nothing in Respondent's testimony suggests otherwise. Petitioner has demonstrated that
Spain is the child's habitual residence,[13] and with that showing has established a *prima facie*
case.

2.    **The "Now-Settled" Defense**

Because Petitioner has made out a *prima facie* case, the Court next considers whether
Respondent has established an affirmative defense.

When a child has been wrongfully retained, Article 12 of the Convention requires the
court to "order the return of the child forthwith" if the petition is filed within one year of the
wrongful retention. Article 12 then provides: "The judicial or administrative authority, even
where the proceedings have been commenced after the expiration of the period of one year
referred to in the preceding paragraph, shall also order the return of the child, unless it is
demonstrated that the child is now settled in its new environment."

This provision thus "allows—but does not require—a judicial or administrative authority
to refuse to order the repatriation of a child on the *sole* ground that the child is settled in its new
environment, *if* more than one year has elapsed between the abduction and the petition for

---

[13]    The Second Circuit has explained that in "relatively rare circumstances," the child's "acclimatization to the
location abroad will be so complete that serious harm to the child can be expected to result from compelling his
return to the family's intended residence." Gitter, 396 F.3d at 134. As an example, the Circuit explained that a child
who has spent fifteen years in one location would likely suffer "serious harm" if he were returned "to the state he
had experienced only at birth." Id. Here, although the Court concludes that LAH is "settled" for purposes of the
Article 12 defense, she is not so "acclimatized" to the United States that her habitual residence has changed.

return." Lozano v. Alvarez, 697 F.3d 41, 51 (2d Cir. 2012), aff'd on other grounds,[14] 134 S. Ct.

1224 (2014) (alteration omitted). Although the merits of the underlying custody dispute are

generally outside the scope of a Hague Convention action, "the Convention's framers

recognized" that "there could come a point at which a child would become so settled in a new

environment that repatriation might not be in its best interest." Blondin v. Dubois, 238 F.3d 153,

164 (2d Cir. 2001).

This affirmative defense, like the others in the Convention, is a "narrow" exception to the

rule that children who have been wrongfully retained must be promptly returned. 42 U.S.C.

§ 11601(a)(4). Respondent bears the burden of the establishing the defense by the

preponderance of the evidence. Id. § 11603(e)(2)(B).

### a.    Determining When the Retention Became Wrongful: Legal Principles

To evaluate this affirmative defense, the Court must first determine when the one-year

period began to run. Such a task is usually straightforward in cases of wrongful removal, but can

be more difficult in cases of wrongful retention. Although the Convention does not specify when

the one-year period begins in such cases, the official Reporter of the Hague Convention notes

that "[t]he fixing of the decisive date in cases of wrongful retention should be understood as that

on which the child ought to have been returned to its custodians or on which the holder of the

right of custody refused to agree to an extension of the child's stay in a place other than that of

its habitual residence." Elisa Perez-Vera, Explanatory Report: Hague Conference on Private

International Law, in 3 Acts and Documents of the Fourteenth Session 426 (1980) ("Perez-Vera

Report" or the "Report"), ¶ 108. This Report—which the Second Circuit has recognized as "an

---

[14]    In Lozano, the Supreme Court held that the one-year period specified in Article 12 is not subject to equitable tolling. 134 S. Ct. at 1228.

authoritative source for interpreting the Convention's provisions," <u>Gitter v. Gitter</u>, 396 F.3d 124,

130 (2d Cir. 2005)-–provides a sound rule for determining when the one-year period begins.

The Court adopts the Perez-Vera Report's definition.

The first part of the Report's test—focusing on the date "the child ought to have been

returned"—suggests that the inquiry will be a fact-specific one.  Indeed, a survey of federal cases

that have attempted to fix the date a retention became "wrongful" reveals a patchwork of fact-

intensive decisions, with few clear rules.  Several observations are appropriate, however.

The very definition of wrongful *retention* means that the party living abroad and with

whom the child originally resided (<u>i.e.</u>, the petitioner) initially consented to the child's travel to

stay with the party who ultimately takes the child to the United States and does not return her

(<u>i.e.</u>, the respondent).  Broadly speaking, the wrongful retention cases address one of two

scenarios: cases in which the petitioner, when initially consenting to the child's travel with

respondent, set a fixed return date and those in which she did not.

The former category corresponds to the first part of the Perez-Vera Report's definition:

the retention in such cases becomes "wrongful" on the date "on which the child ought to have

been returned to its custodians."  Perez-Vera Report ¶ 108.  Perhaps unsurprisingly, when the

petitioner has consented to the child's travel abroad only until a specific date, courts have

concluded that the retention becomes "wrongful" after that date.  See <u>Demaj v. Sakaj</u>, No. 3:09

CV 255(JGM), 2013 WL 1131418, at *3, *7 (D. Conn. Mar. 18, 2013) (where respondent told

petitioner she was taking children to United States for one month, retention became wrongful

when children were not returned at end of one month); <u>Velasquez v. Green</u>, No. 4:12CV66, 2012

WL 2885662 (E.D. Tex. July 13, 2012), <u>report and recommendation adopted</u>, 2012 WL 6569792

(Dec. 14, 2012) (where petitioner allowed child to visit for winter holiday, retention became wrongful when child was not returned by the time classes resumed in January). The petitioner may, of course, consent to an extension of the child's stay, in which case the retention becomes wrongful at the conclusion of the extension. See In re Cabrera, 323 F. Supp. 2d 1303, 1312-13 (S.D. Fla. 2004) (when child was "supposed to return" by March 2002 but the parties "made certain arrangements relating to the child finishing school and then returning," retention did not become wrongful until the later date).

As one might expect, often the petitioner does not set a precise return date: either the petitioner initially consented to an indefinite stay or the parties did not discuss a specific date for return. The Third Circuit's decision in Karkkainen v. Kovalchuk, 445 F.3d 280, 286 (3d Cir. 2006), provides an example of this type of case. In Karkkainen, the petitioner allowed her child to travel to the United States and did not set an explicit return date. Addressing the question of when the retention became wrongful, the Third Circuit explained that there was "unrebutted evidence in the record showing that, by mid-July 2003, [petitioner] had withdrawn her consent to have [the child] remain in the United States beyond August 10, 2003 and that the Respondents were fully aware of this." Id. at 290. The Court thus concluded that the retention became wrongful on August 10, because the petitioner had "unequivocally communicated" to the respondents that she did not consent to the child remaining in the United States beyond that date. Id.

Although the Third Circuit did not cite the Perez-Vera Report for this point, the Court's conclusion mirrors the second half of the Report's description of when a retention becomes wrongful. Because the petitioner in Karkkainen did not set a return date when she permitted the

22

child to leave, it was difficult to determine when the child "ought to have been returned." Perez-Vera Report ¶ 108. The Third Circuit concluded, however, that the retention became wrongful when the petitioner communicated to respondents that she "had withdrawn her consent to have [the child] remain in the United States" beyond a certain date, 445 F.3d at 290—or, in other words, when "the holder of the right of custody refused to agree to an extension of the child's stay in a place other than that of its habitual residence," Perez-Vera Report ¶ 108.[15]

In sum, the case law addressing when a retention becomes "wrongful" is consistent with the rule the Perez-Vera Report proffers. When the petitioner consents to the child's stay with respondent until a specific date, the retention becomes wrongful after that date—the date "on which the child ought to have been returned." Perez-Vera Report ¶ 108. If, on the other hand, the petitioner does not specify a return date at the outset, or initially consents to a stay of indefinite duration, the retention becomes wrongful on the date the petitioner "refused to agree to an extension of the child's stay." Id.

### b.    Whether Petitioner Filed Within One Year

The parties agree that the instant Petition was filed on October 31, 2013, and that the one-year period described in Article 12 is measured from this date. (See dkt. no. 28 at 1; dkt. no. 29 at 1.) Whether the "now-settled" defense is available therefore turns on whether the retention became "wrongful" before October 31, 2012. That is a difficult question: not only do Petitioner and Respondent offer contradictory accounts, but Petitioner's own testimony is internally

---

[15]    In Zuker v. Andrews, 2 F. Supp. 2d 134, 139 (D. Mass. 1998), the Court concluded that a retention does not become wrongful until the petitioner asks that the child be returned and the respondent refuses. Although the petitioner in Zuker asked respondent to return the child in July 1996, the Court explained, the retention did not become wrongful until almost seven months later, when respondent clearly communicated to petitioner that she was not returning. Id. at 140. It is difficult to discern from the case whether the petitioner asked that the child be returned by a specific date and whether the demand was "unequivocal" such that he did not implicitly consent to an extension. Insofar as Zuker is inconsistent with the Perez-Vera Report and the Third Circuit's decision in Karkkainen, however, this Court follows the latter authorities.

inconsistent.

After careful review of the record, the Court concludes that regardless of whether it credits Respondent's testimony or what the Court views as the more plausible version of Petitioner's testimony, the retention became wrongful before October 31, 2012. The "now-settled" defense is thus available to Respondent.

Respondent acknowledged that the parties' May 5, 2010 "Amicable Agreement" obligated him to return LAH to Spain once she obtained her permanent residence. (Tr. 546:24-547:5; Pet'r's Ex. 8 / Resp't's Ex. 99.) He further testified that within thirty days of LAH's arrival in the United States, he told Petitioner that their child had received her permanent residence. (Tr. 553:18-25.) Because Respondent never committed to return the child (id. at 610:7-11), nor did Petitioner ever consent to an extension (id. at 553:14-17, 556:12-22), crediting Respondent's testimony would result in a wrongful retention date of approximately August 12, 2012—a date well in advance of the October 31, 2012 cutoff.

Even if the Court were to reject Respondent's testimony, applying the Perez-Vera Report's definition to the more credible version of Petitioner's testimony necessarily leads to the conclusion that the retention became wrongful before October 31, 2012.

Although, according to Petitioner, it was not until November 25, 2012, that Respondent told her that LAH had received her permanent residence (id. at 100:15-102:2), Petitioner testified unequivocally that she did not consent to LAH remaining in the United States beyond the end of summer 2012. The first reference to the end-of-summer date is in the UCCJEA Action, which Petitioner filed in New York Family Court on August 12, 2013, to enforce the September 10, 2010 custody order from the Dominican Republic. In this filing, Petitioner stated that in July

24

2012

> the child flew to New York to visit with her father, the Respondent. Respondent *was supposed to send the child back to Spain at the end of the Summer*, so the child would be present for the start of the Spanish school year and in the care and custody of the Petitioner, who according to the custody order issued by the Dominican Republic Court is the sole legal guardian of the child.

(Resp't's Ex. 20 at 103 (emphasis added).)  When asked at the hearing in this case whether that

allegation "was true when it was made on [her] behalf," Petitioner affirmed that it was.  (Tr.

191:25-192:4.)

At the hearing, when examined by her attorney, Petitioner further testified as follows:

> [Q.]   Did you think when the child entered the United States in July of 2012 that the father would get her US residency by the end of the summer?
>
> A.     Yes.
>
> Q.     And when the father — did the father tell you by the end of the summer whether or not he had achieved that — gotten that residency for her?
>
> A.     No.
>
> Q.     And when you realized that she had not gotten her residency at that time, did you consent for him to keep the girl longer so that she could get her US residency?
>
> A.     I did not grant my consent.

(Id. at 195:13-24.)

Based on this testimony, the Court finds that regardless of when Petitioner was told that

LAH had obtained her residence, Petitioner did not consent to the child staying in the United

States beyond summer 2012.  Applying the Perez-Vera Report's definition, the retention became

wrongful by the end of summer 2012: "the child ought to have been returned" by that date (see

Resp't's Ex. 20 at 103 ("Respondent was supposed to send the child back to Spain at the end of

the Summer . . . .")), and "the holder of the right of custody refused to agree to an extension of

the child's stay" beyond that date (see Tr. 195:21-24 ("[Q:] And when you realized that she had

not gotten her residency at that time [the end of summer 2012], did you consent for him to keep

the girl longer so that she could get her US residency? [A:] I did not grant my consent."). The

Court further finds that however one measures the "end of summer 2012," the phrase implies a

date before October 31, 2012—and nowhere does Petitioner argue otherwise.

Petitioner also testified at the hearing—in a fashion inconsistent with the statements just

described—that she consented for LAH to remain in the United States "for a maximum period of

six months." (Id. at 97:23-25.) Putting aside the January 6, 2010 "Special Power for Travel

Purposes" (Pet'r's Ex. 7)—which, as explained above, the Court concludes Respondent and his

mother did not sign—Petitioner made no mention of such a date until the Petition she filed with

this Court. Her petition in the UCCJEA Action does not mention the six-month date—and

instead asserts that the child was to be returned by the end of summer 2012—nor does any other

of the many documents Petitioner executed related to the parties' custody dispute. Indeed, the

document Petitioner filed with the Spanish authorities in February 2013, which initiated the

instant Petition, states that in July 2012 "the mother agreed to send the child to New York in

company of the Grandmother Sisa Morales *to stay a couple of months* with the Father, Jose

Leopoldo Alonzo." (Pet'r's Ex. 31 at 9 (emphasis added).) Although "a couple of months" is

not necessarily inconsistent with "six months,"[16] if the six-month date was as definite as

Petitioner now claims it is, one would have expected her to have mentioned it in that filing, or in

her UCCJEA petition, or at least at some point before the instant Petition—when the importance

---

[16]    "A couple of months," measured from July 11, 2012, is of course more consistent with the "end of summer 2012" than with January 11, 2013.

of the scope of her consent became apparent.

Petitioner makes several arguments urging the Court not to adopt the end-of-summer date. She first asserts that the Court should not adopt that date because Respondent never agreed to it. (Pet'r's Reply Br. at 3.) To be sure, if one parent fails to inform the other parent that she does not consent to the child's stay beyond a particular date, it would be difficult to say that retention beyond that date is wrongful. But this is not such a case. Here, even if there was some confusion at the outset about the child's expected return date, Petitioner testified unequivocally that she did not consent to the child's stay beyond the end of summer 2012—regardless of whether LAH had received her permanent residence by that time. (Tr. 195:21-24.) Although Petitioner did not explicitly testify that she demanded the child's return at the end of summer 2012, she did testify that (1) she spoke to Respondent "[m]any a time during the months of August and September" (id. at 100:13-16), and (2) that she did not consent to the child's continued stay (id. at 195:21-24). In the Court's view, Petitioner made her demand sufficiently clear to Respondent.[17]

This case is thus analogous to Karkkainen. There, the Third Circuit explained, although the scope of petitioner's consent was unclear at the outset of the child's trip, the petitioner subsequently made clear that she did not consent to the child's stay beyond a particular date. 445 F.3d at 290. The Court held that the retention became wrongful after that date. Id. at 290-91.

Petitioner in this case also asserts that because she offered to allow the child to finish the 2012-2013 school year in the United States, the retention did not become wrongful until June 2013. (Pet'r's Br. at 15.) If Respondent had agreed to such an extension, Petitioner's argument

---

[17]    Respondent testified that after he told Petitioner in early-to-mid August that LAH had received her residence, Petitioner "continued insisting[ ] 'send the girl to me, send the girl back to me, send the girl back to me.'" (Tr. 554:11-12.)

27

would be more viable. See In re Cabrera, 323 F. Supp. 2d 1303, 1312-13 (S.D. Fla. 2004) (concluding that the parties' "arrangements" permitting the child to return after finishing school reset the one-year period). Both parties testified, however, that Respondent did not agree to this proposal. (Tr. at 106:17-21, 592:17-19, 594:6-9; Pet'r's Ex. 48A at 4.) That Petitioner outlined a proposal by which she would consent to an extension is different from saying that she in fact consented to an extension.[18]

The Court therefore concludes—based on Petitioner's unequivocal testimony that she did not consent to Respondent keeping LAH beyond the end of summer 2012, corroborated by her previous filing in the UCCJEA Action that Respondent "was supposed to send the child back to Spain at the end of the Summer, so the child would be present for the start of the Spanish school year"—that Respondent's retention of LAH became wrongful as of the end of the summer of 2012. Because her Petition was filed over one year after the end of summer 2012, the "now-settled" defense is available to Respondent.

c.    **Whether LAH is Settled in the United States**

Although the Hague Convention does not define the phrase "settled," the Second Circuit has explained that the term "should be viewed to mean that the child has significant emotional and physical connections demonstrating security, stability, and permanence in its new environment." Lozano v. Alvarez, 697 F.3d 41, 56 (2d Cir. 2012). Although courts "may consider any factor relevant to a child's connection to his living arrangement," the Circuit has explained that courts should "generally" consider:

        (1) the age of the child; (2) the stability of the child's residence in the new

---

[18]    By Petitioner's reasoning, the retention would not become wrongful until June 2013, the end of the school year. Petitioner filed her initial request for return with the Spanish authorities in February 2013, however, suggesting that even she did not adopt this position. (Pet'r's Ex. 31 at 12.)

environment; (3) whether the child attends school or day care consistently; (4) whether the child attends church or participates in other community or extracurricular school activities regularly; (5) the respondent's employment and financial stability; (6) whether the child has friends and relatives in the new area; and (7) the immigration status of the child and the respondent.

Id. at 56-57.

A review of these factors overwhelmingly favors a conclusion that LAH is settled in the United States.

Age of the Child: Although the child's age can arguably cut in either direction, courts generally conclude that repatriation of an infant is less burdensome on the child than repatriating an older child, who is more likely to have memories of the United States and more ties to the country. See In re D.T.J., 956 F. Supp. 2d 523, 534 (S.D.N.Y. 2013) ("Unlike in the case of a young child, D.T.J.'s two years in the United States have occurred at a time in her life when she is acutely aware of her surroundings and able to form attachments and connections."). Here, LAH was eight years old at the time of the Petition and had been in the United States for over fifteen months. The Court concludes that these facts support a finding that she is settled. See Ramirez v. Buyauskas, No. 11-6411, 2012 WL 606746, at *17 (E.D. Pa. Feb. 24, 2012) (concluding that an eight year old was "old enough to have formed meaningful connections to the United States, including friendships with other children and with respondent's family"); In re Lozano, 809 F. Supp. 2d 197, 232 (S.D.N.Y. 2011) aff'd, Lozano v. Alvarez, 697 F.3d 41 (2d Cir. 2012) (concluding that a five year-old child, who had been in the United States for sixteen months, was settled).

Stability of the Child's Residence: The Supreme Court recently held in Lozano v. Alvarez, 134 S. Ct. 1224, 1236 (2014), that equitable tolling did not apply to the one-year period

described in Article 12, even if an abductor takes steps to conceal the child's whereabouts. Underlying the Court's reasoning was the proposition that "American courts have found as a factual matter that steps taken to promote concealment can also prevent the stable attachments that make a child 'settled.'"  Id. at 1236.  For this statement, the Court cited among other authorities Mendez Lynch v. Mendez Lynch, 220 F. Supp. 2d 1347, 1363-64 (M.D. Fla. 2002), which it parenthetically described as holding "children not settled when they 'lived in seven different locations' in 18 months."  Id.  Thus, this Court places great weight on the "stability of the child's residence" factor.  See also In re D.T.J., 956 F. Supp. 2d at 535 (noting that the stability of the child's new environment "plays a significant role in the 'settled' inquiry).

Here, since arriving in the United States, LAH has lived in the same apartment, with the same family members (her father and grandmother), and has attended the same school.  (Tr. 232:12-18, 501:9-17).  This factor strongly favors a finding that LAH is settled.

Whether the Child Attends School Consistently:  LAH has attended PS4 since arriving in the United States.  (Id. at 501:9-17.)  Her report card from the 2012-2013 school year, when she was in the second grade, reveals consistent attendance and improvement over the course of the year.  (Resp't's Ex. 27.)  Sonia Portugal, a social worker who has been working with LAH in therapy sessions since March 2013, testified that she has observed a significant improvement in the child's behavior since beginning treatment.  (Tr. 344:6-7, 360:9-23.)  Ms. Portugal also noted that LAH "loves reading and English" and, within the eight-to-ten-student group Ms. Portugal treats, LAH is "one of the best readers."  (Id. at 16-20.)  This evidence of marked improvement is consistent with Respondent's testimony, in which he described giving LAH lessons in math and other subjects and the resulting improvement.  (Id. at 514:25-515:24.)  The Court also notes that

30

during its interview of LAH, she was well-behaved and spoke almost exclusively in English. During that interview, she remarked that she studies hard (id. at 249:22-23); proudly proclaimed her "point" level at school (a "10.6," which is "[v]ery, very good") (id. at 247:3-5);  and explained that music was her favorite subject, noting that she looked forward to joining chorus next year in fourth grade (id. at 270:14-24).

The child's consistent attendance at school and academic improvement strongly favor a finding that she is settled.

Participation in Extracurricular and Community Activities:  Respondent offered evidence that he has participated in various activities with LAH at her school and with other community organizations. (Resp't's Exs. 16, 19, 28.)  While speaking with the Court, LAH stated that she attends church with her father two times per week. (Tr. 251:24-252:6.)  These facts support a finding that the child is settled.

Respondent's Employment and Financial Stability:  Petitioner's argument that the child is not "settled" largely focuses on this factor.  Asserting that LAH's "life in New York is not financially secure," Petitioner emphasizes that LAH and Respondent are on Medicaid and receive other forms of public assistance; that Respondent considers his job as a waiter at Columbia University only a "temporary" one; and that LAH shares a bedroom (and bed) with her grandmother.  (Pet'r's Br. at 16 (citing Tr. 560:7-17).)

Although Respondent's household income is limited, the record demonstrates that he is a hardworking individual who has been consistently employed.  Respondent, who graduated with a degree in computer engineering from a university in the Dominican Republic, began working at McDonalds shortly after arriving in the United States in spring 2011.  (Tr. 492:6-10, 559:6-8.)

31

His yearly salary was $11,000. (Id. at 559:9-11.) In approximately November 2013, he began his current job as a waiter at Columbia University, which pays $15 per hour. (Id. at 492:21-493:1, 559:12-22.) Respondent testified that he intends to begin taking classes toward an associate's degree at City College this year. (Id. at 493:2-8.) The record suggests that LAH's basic needs are being met, even if Respondent's family has less disposable income than other families in Manhattan. Respondent's consistent employment and relative financial stability—albeit with some reliance on public assistance—support a finding that the child is well-settled.

The Child's Relationships with Family and Friends: During her conversation with the Court, LAH recounted the names of her closest friends in school and described another—her "favorite friend"—whom she met outside of school. (Id. at 250:22-251:14.) Both Respondent and his mother confirmed that LAH spent time with friends outside of school and described taking her to playdates. (Id. at 231:10-16, 516:17-517:1.) They also testified about the other family members that live nearby, including two of Respondent's aunts, two uncles, and a number of cousins, and explained that LAH sees them frequently during the week and on weekends. (Id. at 231: 17-25, 515:25-516:16.)

LAH advised the Court that her father helps with her homework (id. at 250:18-19); that her grandmother and father cook for her and take her to and from school (id. at 247:12-13, 250:20-21); that her grandmother helps bathe and dress her (id. at 249:5-8); and that if she has a problem or is "sad about something," she talks to her father, who "take[s] good care" of her (id. at 251:17-21).

That LAH has developed friendships and is surrounded by caring family members favors a finding that she is well-settled.

32

Respondent's and the Child's Immigration Status: Both Respondent and LAH are legal permanent residents of the United States. As the Second Circuit has explained, this fact favors a finding that the child is well-settled. See Lozano v. Alvarez, 697 F.3d 41, 58 (2d Cir. 2012) (noting that immigration status is an appropriate consideration in the "settled" inquiry because it affects how long the child will be able to stay in the United States and whether she will be entitled to certain government benefits).

Other Factors: Petitioner also argues that the Court should not separate LAH from her half-sister, W, who resides with Petitioner in Spain. (Pet'r's Reply Br. 6-7.) Petitioner rightly points out that courts have hesitated to separate siblings. See, e.g., Ermini v. Vittori, No. 12 Civ. 6100(LTS), 2013 WL 1703590, at *17 (S.D.N.Y. Apr. 19, 2013).

The Court takes this consideration very seriously; indeed, LAH mentioned to the Court her affection for her sister and desire to see her again. (Tr. 262:15-23.) Here, however, several facts about LAH's relationship with W make this factor less compelling: in particular, that LAH and W lived together only for a limited period. W was born on November 8, 2010, in Spain. (Id. at 67:9-10.) Even though Petitioner had custody of LAH after August 2010, at the time of W's birth LAH was still in the Dominican Republic living with Petitioner's family. (Id. at 53:21-25, 558:5-11.) LAH did not arrive in Spain until February 2011, and she left again in May 2012. (Stipulations ¶¶ 8, 11.) The children were therefore together for only fifteen months, and LAH left before W was one-and-a-half years old. At the time the Petition was filed, they had been apart for over seventeen months.

In view of the relatively limited period of time LAH and W spent together, particularly in light of their subsequent time apart, the need to keep them together—while indisputably

33

important—is less pronounced than the sibling relationships in the other cases Petitioner cites. See Ermini, 2013 WL 1703590, at *1, *9-*10 (noting the importance of the relationship between seven- and nine-year-old brothers, where younger brother, who was developmentally disabled, looked up to older brother "as a kind of super hero"); Broca v. Giron, No. 11 CV 818(SJ)(JMA), 2013 WL 867276, at *1, *9 (E.D.N.Y. Mar. 7, 2013), aff'd, 530 F. App'x 46 (2d Cir. 2013) (declining to separate three siblings, who were, at the time of hearing, between nine and fourteen years old). Although the separation of a child from his or her sibling can understandably lead a child to be less settled in a new environment, this factor does not outweigh the other factors here, all of which strongly support a finding that LAH is settled.

d.    **Whether Return is Nonetheless Appropriate**

The Court recognizes that it may order repatriation notwithstanding Respondent's proof of an Article 12 defense. See Blondin v. Dubois, 238 F.3d 153, 164 (2d Cir. 2001) ("As we read Article 12, it allows—but does not, of course, require—a judicial or administrative authority to refuse to order the repatriation of a child on the *sole* ground that the child is settled in its new environment, *if* more than one year has elapsed between the abduction and the petition for return."). It chooses not to do so here.

It is true, as the extensive discussion above shows, that although the Petition was filed over one year after the retention became wrongful, Petitioner did not miss the one-year cutoff by much. This is not a case in which Petitioner waited years to assert her custody rights. It is also true that, at least according to Petitioner's account, part of the one-year delay was due to Petitioner's attempts to resolve the dispute without resorting to litigation—an approach that not only preserves both the parties' and the courts' resources, but also one that avoids subjecting the

family to the strain of litigation.  Petitioner should be commended for her attempts to resolve the case consensually.  These, however, are not the only relevant considerations.

The child's interest in remaining settled is also a factor the Court may consider.  As the Supreme Court has explained, while the Convention "reflects a design to discourage child abduction," it "does not pursue that goal at any cost."  Lozano v. Alvarez, 134 S. Ct. 1224, 1235 (2014).  In certain instances, "the child's interest in settlement" may overcome the petitioner's right to adjudicate the custody dispute in the child's habitual residence.  Id.  This is one of those cases.

Because the evidence shows overwhelmingly that LAH is now settled—indeed, thriving—in the United States, the Court declines to exercise its authority to order repatriation notwithstanding Respondent's Article 12 defense.[19]

## CONCLUSION

The Petition is denied.  The Clerk of Court is respectfully requested to close the case.[20]

SO ORDERED.

Dated:  May 16, 2014
        New York, New York

_____
Ronnie Abrams
United States District Judge

---

[19]      Respondent also raises two other affirmative defenses: returning LAH to Spain would expose her to a grave risk of harm and she objects to being returned (and is mature enough that her views should be considered).  (See Resp't's Br. 18-25.)  The Court need not consider these arguments because it has concluded that Respondent has established an Article 12 defense that precludes the relief Petitioner seeks.

[20]      Counsel for all parties acted *pro bono* in this matter.  The Court is grateful for the superb advocacy on both sides of the case.

35